**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| TONIA TAGGART ADAMS, <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, <br><br> Defendant. | CASE NO. 5:21-CV-01465-AMK <br><br><br> MAGISTRATE JUDGE AMANDA M. KNAPP <br><br><br> **MEMORANDUM OPINION & ORDER** |

Plaintiff Tonia Taggart Adams ("Plaintiff" or "Ms. Adams") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This matter is before this Court by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 14.)

For the reasons set forth below, the final decision of the Commissioner is **AFFIRMED**.

**I. Procedural History**

On May 22, 2019, Ms. Adams filed an application for DIB. (Tr. 54-55.) She alleged a disability onset date of January 1, 2014. (*Id*.) She alleged disability due to headaches, anemia, lupus, nausea, trouble sleeping, Menards disease, sciatica, chronic fatigue, and blood clot. (*Id*.) Her application was denied at the initial level (Tr. 64) and upon reconsideration (Tr. 79), and she requested a hearing (Tr. 93-94). On July 28, 2020, a hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 29-81.)

1

On August 20, 2020, the ALJ issued a decision finding Ms. Adams had not been under a disability within the meaning of the Social Security Act from January 1, 2014 through the date of the decision.  (Tr. 12-28.)  On May 28, 2021, the Appeals Council denied Ms. Adams' request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On July 28, 2021, Ms. Adams filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 9, 12.)

## II.  Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Adams was born in 1960 and was 53 years old on the alleged disability onset date, making her a an individual closely approaching advanced age under Social Security Regulations at all relevant times.  (Tr. 15.)  She had at least a high school education.  (Tr. 170.)

### B. Medical Evidence

Although the ALJ identified two severe impairments (Tr. 17), Ms. Adams' assignment of error relates only to the ALJ's assessment of her migraine headaches (ECF Doc. 9, pp. 8-13). Additionally, the relevant period in this case is between the January 1, 2014 alleged onset date and the June 30, 2014 date last insured.  (*See* Tr. 54.)  The evidence summarized herein is accordingly focused on the evidence pertaining to Ms. Adams' migraine headaches between January and June 2014.

#### 1. Relevant Treatment History

Akron General Medical Center performed a brain CT without contrast of Ms. Adam's brain on August 12, 2013, and the reviewing radiologist described the results as "[w]ithin normal limits."  (Tr. 1066.)

On November 27, 2013, Ms. Adams saw Samar Narouze, M.D., at the Center for Pain Medicine White Pond for severe headaches, and left side neck and shoulder pain.  (Tr. 248.)  She described her migraine headaches as frontal, throbbing, associated with shoulder pain, and nausea.  (*Id*.)  She reported she had daily headaches since she was a little girl, each lasting a few hours.  (*Id*.)  Light and sound increased her pain, and she had difficulty sleeping.  (*Id*.)  She had a Botox injection the month before, which was somewhat helpful (*Id*.)  She reported quitting her job two weeks prior.  (*Id*.)  On examination, she demonstrated mild tenderness to palpation over the cervical paraspinal muscles and the trapezius, good range of motion in her cervical spine, and positive facet loading.  (Tr. 249.)  Dr. Narouze diagnosed cervicalgia, headache, chronic migraine, which was intractable but without aura.  (*Id*.)  He decreased her Depakote dosage, started Zanaflex, recommended a bilateral occipital nerve block, advised her to consider an IV infusion of lidocaine, and told her she could have another Botox treatment in three months.  (*Id*.)

On December 3, 2013, Dr. Narouze administered an occipital nerve block.  (Tr. 251.)  There were no complications, and he advised Ms. Adams to return in two weeks for a repeat injection.  (*Id*.)  Ms. Adams received a second occipital nerve block on December 20, 2013.  (Tr. 253.)  She reported the initial nerve block had provided "50% pain relief for 1 ½ weeks, 30% pain relief ongoing since last injection."  (*Id*.)  There were no complications, and Dr. Narouze advised her to return in eight weeks for reevaluation.  (Tr. 253-54.)

Ms. Adams returned to the Center for Pain Medicine on February 3, 2014, and reported she had received 50% relief from the occipital nerve blocks for about two weeks, but that her headaches were back to baseline.  (Tr. 255.)  She reported daily throbbing headaches, lasting less than 24 hours.  (*Id*.)  She reported taking six to eight aspirin every day, and Jacob Sisko, PA-C advised her that this could cause medication overuse headaches.  (*Id*.)  On examination, she

demonstrated allodynia to her lower lumbar spine and right sacroiliac joint, and somewhat limited plantar flexion, right dorsiflexion, knee extension and hip flexion. (*Id*.) Her Zanaflex and gabapentin were continued, and she was advised to taper her aspirin use. (Tr. 256.) PA-C Sisko also recommended three IV lidocaine infusions over the following three weeks. (*Id.*)

Ms. Adams returned to the Center for Pain Medicine on February 12, 2014, and received an IV lidocaine infusion. (Tr. 257.) She was advised to return in two weeks for a second infusion. (Tr. 258.) She followed up with PA-C Sisko on February 27, 2014, where she reported that she received no relief from the lidocaine infusion. (Tr. 259.) She continued to complain of daily piercing headaches. (*Id*.) She reported that she was down to using four aspirin daily, but also reported overuse symptoms that included nosebleeds and pounding headaches. (*Id.*) PA-C Sisko again counseled her to taper off aspirin use. (*Id*.) Examination results were unchanged, except that PA-C Sisko noted "[r]educed strength questionable effort due to pain." (*Id*.) He continued her prescriptions for gabapentin and Zanaflex, initiated treatment with tramadol, and advised her to taper off aspirin. (Tr. 260.)

Ms. Adams returned to the Center for Pain Medicine on April 30, 2014, where Dr. Narouze administered ketamine IV infusion therapy to treat her migraine headaches. (Tr. 267.)

On May 7, 2014, Ms. Adams saw neurologist Hossein Ansari, M.D., of the Western Reserve Health System. (Tr. 1061.) She reported chronic daily headaches that she described as throbbing and severe with nausea, lightheadedness, sensitivity to light, and decreased appetite. (Tr. 1061-62.) Dr. Ansari observed that her underlying headache disorder was "certainly chronic migraine without aura," but noted that "no other reason or triggering factor . . . exists or is clear to me." (Tr. 1061.) He indicated that it was "clear on the exam that patient had very severe trigger points for her migraines which included left occipital area and left temporal," and

4

possible intranasal trigger points.  (*Id.*)  He observed there was also "a significant psychiatric component" of mood disorder with depression and anxiety, and noted he was "not sure if it is a primary issue or it is secondary to headache."  (*Id.*)  Examination results were in the normal range, except that Dr. Ansari noted severe to moderate pain in her head and neck and depressed mood.  (Tr. 1063-64.)  He continued her Zanaflex, increased her gabapentin dose, and prescribed prochlorperazine maleate, naratriptan, and atenolol.  (*Id.*)  He also referred Ms. Adams for physical therapy.  (*Id.*)

PA-C Sisko treated Ms. Adams again on May 20, 2014.  (Tr. 269.)  She reported ongoing headaches that were exacerbated by light and sound and interfered with her daily activities.  (*Id.*)  However, she reported that she was tolerating the increased dosage of gabapentin well, had completed her aspirin taper, and had begun physical therapy, which was helping.  (*Id.*)  PA-C Sisko prescribed amitriptyline and tramadol and increased her dosage of Zanaflex.  (Tr. 270.)

Ms. Adams followed up with Dr. Ansari on July 9, 2014.  (Tr. 368.)  She reported the frequency of her headaches remained the same but the intensity was decreasing.  (*Id.*)  She could not tolerate a higher dose of amitriptyline, and found it was not helping with her headaches.  (*Id.*)  Dr. Ansari discontinued that medication.  (*Id.*)  Ms. Adams also reported she had stopped attending physical therapy because it did not reduce her headaches, even though it did help with her neck pain.  (*Id.*)  Dr. Ansari continued Zanaflex, prochlorperazine maleate, naratriptan, and atenolol, increased Ms. Adams' dosage of gabapentin, prescribed Zomig nasal spray as a migraine rescue medication, and noted that her pain management provider had referred her to a chiropractor.  (*Id.*)

Ms. Adams again followed up with Dr. Ansari on September 22, 2014.  (Tr. 365.)  She continued to report daily headaches which were "multifactorial."  (*Id.*)  Dr. Ansari stated it was

5

"very clear" that Ms. Adam's "mood [was] not under control" and he advised her that she would benefit from a psychiatric referral for her underlying psychiatric issue. (*Id*.) He concluded that gabapentin and Zomig were not working so he tapered her off those medications. (*Id*.) Dr. Ansari scheduled her for trigger point injections, continued her other medications, and prescribed rizatriptan benzoate. (Tr. 365-66.)

Ms. Adams returned for an unscheduled follow up with Dr. Ansari on December 3, 2014, seeking relief for a migraine that had begun two days prior. (Tr. 1053.) Dr. Ansari performed a migraine infusion. (Tr. 1050.)

2. **Opinion Evidence - State Agency Reviewers**

State agency reviewing physician Douglas Chang, M.D., reviewed the record in September 2019 and opined that Ms. Adams was limited to medium work with additional postural limitations by the date last insured in June 2014. (Tr. 60-63.) State agency reviewing physician James Cacchillo, D.O., reviewed the record in November 2019 and agreed with Dr. Chang's assessment of Ms. Adam's limitations. (Tr. 70-73.)

C. **Hearing Testimony**

1. **Plaintiff's Testimony**

At her July 28, 2020 hearing, Ms. Adams testified that she lived with her husband in 2014, and that he was her main source of financial support. (Tr. 36.) She did have a driver's license and could drive for "a couple hours" without difficulty. (Tr. 37.)

Her past work included work as a reservation agent for Marriott hotels and as a night auditor at a Courtyard by Marriott. (Tr. 37-39.) The reservation agent job involved sitting and taking calls, with no lifting. (Tr. 38.) The night auditor job involved tallying up accounts, producing and delivering guest invoices, loading the refrigerator, and doing laundry. (Tr. 39-40.)

6

She reported that she stopped working because of her migraines, and because the night auditor job involved a lot of standing, which aggravated her sciatic nerve. (Tr. 40.) She asserted that her headaches were severe and came without warning about every other month, causing her to "constantly take off work." (Tr. 41-42.) The headaches lasted four or five days and often did not respond to medication. (Tr. 42.) She also reported that she sometimes needed to be admitted to the hospital, where she received morphine or Dilaudid to break the headache. (*Id*.)

    2.    **Vocational Expert's Testimony**

A Vocational Expert ("VE") testified that a hypothetical individual of Ms. Adams' age, education, and work experience who had the functional limitations described in the ALJ's RFC determination could perform both Ms. Adams' past work as a reservation agent and representative positions in the national economy, such as merchandise marker, office helper, and sorter. (Tr. 51.) He also testified that a worker who is off task more than 10% of the workday or misses more than one day per month is unemployable. (Tr. 52.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, which is summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his August 25, 2020 decision, the ALJ made the following findings:[1]

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.  (Tr. 17.)

---

[1] The ALJ's findings are summarized.

8

2. The claimant has not engaged in substantial gainful activity during the period from January 1, 2014 to June 30, 2014. (*Id.*)

3. The claimant has the following severe impairments: migraine headaches and degenerative disc disease of the lumbar spine. (*Id.*)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.)

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant could have frequently stooped, crouched, crawled, climbed ramps and stairs, but could have never climbed ladders, ropes or scaffolds; the claimant would have needed to avoid environments with more than moderate noise levels, and would have needed to avoid concentrated exposure to moving mechanical parts and operation of a motor vehicle. (*Id.*)

6. The claimant is able to perform her past relevant work as a reservation agent. (Tr. 21.)

Based on the foregoing, the ALJ determined that Ms. Adams had not been under a disability, as defined in the Social Security Act, from January 1, 2014 through June 30, 2014. (Tr. 23.)

V. **Plaintiff's Arguments**

Ms. Adams raises a single assignment of error, asserting that the ALJ's finding that she can perform light work is not supported by substantial evidence because he failed to properly analyze her maximum RFC pursuant to SSR 19-4p. (ECF Doc. 9, p. 8.)

VI. **Law & Analysis**

A. **Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

9

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: Whether ALJ Properly Analyzed Ms. Adams' Migraine Headaches in Keeping with SSR 19-4p**

Ms. Adams asserts that the ALJ failed to properly address the requirements of Social Security Ruling ("SSR") 19-4p – which governs the evaluation of primary headache disorders – in assessing her migraine headaches. (ECF Doc. 9, p. 9.) More specifically, she argues the ALJ "did not sufficiently consider the effect of [her] migraine headaches on her ability to sustain work, day in and day out." (*Id*. at p. 12.) The Commissioner responds that the ALJ adequately addressed the requirements of SSR 19-4p and adopted an RFC that was supported by substantial evidence, and that Ms. Adams has not demonstrated otherwise. (ECF Doc. 12, pp. 10-12.)

SSR 19-4p provides guidance on how "primary headache disorders" such as migraines, chronic tension-type headaches, and trigeminal autonomic cephalalgias / cluster headaches are established and evaluated. *See* SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug 26, 2019). In pertinent part, SSR 19-4p provides:

> If a person's primary headache disorder, alone or in combination with another impairment(s), does not medically equal a listing at step three of the sequential evaluation process, we assess the person's residual functional capacity (RFC). <u>We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC</u>. The RFC is the most a person can do despite his or her limitation(s).

11

> We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration. Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC.

SSR 19-4p, 84 Fed. Reg. at 44671 (emphasis added).  Ms. Adams argues the ALJ failed to comply with SSR 19-4p because he did not adequately "consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC," and in particular did not account "for the frequency of [her] headaches in his RFC in terms of sustaining work or being absent from work."  (ECF Doc. 9, p. 12.)

> The ALJ analyzed Ms. Adams' migraine headaches and SSR 19-4p as follows:
>
> In terms of the claimant's alleged migraine headaches, the record indicates a history of chronic daily headaches, for many years (1F/8), beginning at age six (8F/48). Because this is the case, I expect that the "ruling-out" process contemplated by Social Security Ruling 19-4p would have taken place long before the alleged onset date. That being the case, I give full acknowledgement to the diagnosis of migraine headache, dated November 27, 2013 (2F/2). While this diagnosis would be consistent with the claimant's allegations of headaches, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.
>
> Diagnostic scanning of the claimant's head, dated August 9, 2013, was normal and age appropriate (1F/8).
>
> Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated November 27, 2013, which reported that the claimant was well-appearing and in no acute distress, with no cranial nerve deficits, but mild tenderness to the cervical paraspinal muscles, and positive facet loading testing, but good cervical range of motion (2F/2), one dated February 27, 2014, which indicated that the claimant was well appearing and in no acute distress [while in the midst of a headache described as "pounding"], with no neurological deficits (2F/12), or one dated May 20, 104 [sic], which indicated that the claimant was well appearing and in no acute distress, with no neurological deficits (2F/22-23).
>
> The claimant had failed multiple forms of treatment, medications and combinations of medications at the outset of this claim (1F/8). During the period leading up to, and concluding with, her date last insured, she engaged in multiple other forms of treatment, all without significant success, including "Botox" injections [partially effective (2F/1)], occipital nerve blocks [50% efficacy in the short-term, fading

12

> over two weeks (2F/6, 8)], "Lidocaine" infusions [no effect (2F/10, 12)], and "Ketamine" infusions [no effect (2F/22)]. She underwent eleven sessions of physical therapy, which she described as helpful on the day of therapy itself, but with no lasting benefit (2F/22), and was discharged on June 24, 2014 (3F/32).
>
> Although I have identified this impairment as severe, <u>I note the following, pursuant to Social Security Ruling 19-4p.</u> <u>Multiple treating sources have maintained differential diagnoses, including medication overuse (2F/12), (5F/7), cervicogenic (5F/1), and involving a significant psychological component (8F/47).</u>
>
> <u>The record reveals that the claimant's allegedly disabling impairment was present at approximately the same level of severity, long prior to the alleged onset date (1F/8), (8F/48). The fact that the impairment did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work</u>.

(Tr. 19-20 (brackets in original) (emphasis added).) The ALJ then went on to further assess the intensity, persistence, and limiting effects of Ms. Adams' reported symptoms as follows:

> In sum, the evidence would indicate that the symptom limitations relevant to this impairment were not as severe as alleged. . . .
>
> Because of the remote nature of the date last insured, <u>there is little information included regarding that claimant's activities of daily, save the notation that these activities were improved with treatment</u> (2F/12).
>
> The following observations, recorded pursuant to Social Security Ruling 16-3p, have also informed the conclusions announced in this decision. <u>Various treatment providers reported questionable (2F/12) or minimal (8F/266) effort on testing, or that the claimant refused testing outright</u> (2F/23). <u>On February 27, 2014, in the midst of what she described as a pounding headache, the claimant nevertheless presented clinically as well appearing and in no acute distress</u> (2F/12).
>
> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, <u>the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision</u>.

(Tr. 21-22 (emphasis added).) In discussing the opinions of the state agency medical consultants, the ALJ further observed "[t]he record shows a claimant with chronic headaches, but which have been present since the claimant was aged six, and had not affected her ability to amass past relevant work[.]" (Tr. 21 (citations omitted).)

13

Consistent with the requirements of SSR 19-4p, it is evident that the ALJ did consider and discuss the limiting effects of Ms. Adams' migraine headaches, including her reports that she had suffered chronic daily headaches since she was six years old, and her use of multiple forms of treatment for her migraines "without significant success." (Tr. 19.) However, also consistent with the requirements of SSR 19-4p, the ALJ additionally considered the extent to which Ms. Adams' reported symptoms were consistent with and supported by the other evidence of record. For example, he noted that she was well-appearing and in no acute distress during office visits, even when reportedly in the midst of a "pounding" headache, that her imagery and physical examinations were largely unremarkable, that her differential diagnoses included medication overuse and a significant psychological component, that limited evidence regarding her activities suggested improvement with treatment, and that some providers reported questionable or minimal effort on testing or an outright refusal to test. (Tr. 19-22.)

Ms. Adams does not argue that the ALJ misconstrued the evidence or neglected to acknowledge material evidence or findings. Instead, she contends that the "it is reasonable to assume from [Ms. Adams'] testimony, the evidence of record, and [her] underlying medical impairments that [she] will miss work more than once per month." (ECF Doc., p. 12.) In other words, "given her diagnosis and her ongoing attempts to control her headaches," Ms. Adams contends that the RFC adopted by the ALJ "should not stand as supported by substantial evidence" because it does not include off task or absentee limitations. (*Id.*)

Effectively, Ms. Adams argues that the ALJ's failure to include specific sustainability limitations in the RFC necessarily reflects that his RFC determination was not supported by substantial evidence. This ultimately amounts to an argument that the records support greater limitations than those found by the ALJ. However, "'[t]he substantial-evidence standard

14

. . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545). That means this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ," regardless of whether substantial evidence – or even a preponderance of evidence – supports Ms. Adams' more restrictive reading of the evidence. *Jones*, 336 F.3d at 477; *see also Blakley*, 581 F.3d at 406.

Here, the record reflects that the ALJ considered Ms. Adams' subjective complaints and unsuccessful attempts at treatment, but also the limited objective evidence in support of her complaints, her lengthy history of similar complaints (even while working), differential diagnoses that suggested other causes for her complaints, and the limited nature of any evidence regarding her activities at the relevant time due to the remote nature of her claims. He was not required to accept her subjective complaints at face value. *See Jones*, 336 F.3d at 476 ("an ALJ is not required to accept a claimant's subjective complaints"). After considering all of the record evidence, the ALJ concluded that the intensity, persistence, and limiting effects of her reported symptoms was not entirely consistent with the evidence. (Tr. 21.) Nevertheless, he adopted an RFC that accounted for her headache disorder and reported pain by restricting her to light work in an environment with no more than moderate noise levels, no concentrated exposure to moving mechanical parts or operation of motor vehicles, and no climbing of ladders, ropes, and scaffolds. (Tr. 18, 21.)

For the reasons specified above, the undersigned finds the ALJ's evaluation of the impact of Ms. Adams' migraine headaches on her RFC was consistent with the requirements of SSR 19-4p, and that Ms. Adams has not met her burden to demonstrate that the RFC lacked the support

of substantial evidence. Accordingly, the undersigned finds Ms. Adams' sole assignment of error to be without merit.

## VII. Recommendation

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED**.

March 1, 2023

                                              */s/Amanda M. Knapp*
                                              AMANDA M. KNAPP
                                              United States Magistrate Judge